I'm Steven Koch, Your Honor, and I represent Lacey Myers and her parents. Lacey is now an adult. She was three years old when all this started, poisoned in the summer of 99 to 2000, and she is now 18 years of age, 19, something like that. And through all of this process, going through this trial twice, this family has suffered, and that's the reason I'm here. I'm here because the district court below committed what I consider to be reversible errors. And most importantly, the district court below exhibited his attitude about the decision that this court made last time, and in a subsequent hearing, tried to blame me for the court's decision as if this court did not have its own scholarship capabilities. And personally denigrated my integrity. Hey, I got a thick skin. That doesn't bother me. No, you're talking about there are several different hearings. So are you talking about the status conference that was held following our opinion? So I think it was held three months later. Right. That's when, in that, spreading the mandate. Right. Spreading the mandate. So I distinguish them. The subsequent hearing was actually in September of 2014. Right. And that was some 16 months after the trial, but two months before he rendered the decision. And that's the hearing, if I recall the record correctly, where he actually played the audio tape of the appellate argument. Yes. And then accused you of manipulating the court in some fashion. Yes. And I mean, he was not happy with me because I made a motion for a status conference. I said, last time it took you three years to rule. This time, here it is 18 months after the conclusion of the second phase of the trial. My clients want to know what's going on. I don't know how to answer them. He did not like that. He didn't like being challenged in any way, shape, or form. And I understand that. But I had to do what I had to do. And what I did was totally appropriate. And then when I got there, when he started playing the tape recording of the oral argument, I mean, it reminded me of Humphrey Bogart and McCain mutiny on the stand with, you know, manipulating those ball bearings. Counsel, unfortunately, judges are displeased with attorneys on numerous occasions. But how does that amount to reversible error in this case? This went so far beyond the normal sort of peak that a judge might have at a lawyer or vice versa. You know, we do the same. We have the same feeling sometimes. But when he demonstrated that he basically blamed me for his reversal and that he questioned my integrity, which is the first time that's ever happened. But didn't the court state on the record that whatever shortcomings he attributed to you, he would not impute those to your client? Well, he said a lot of things like that. Yes, but doesn't that then negate any determination that there was a spillover into the objectivity of his ruling? Your Honor, not when at the same time he says, I'm going to get the last word. And I know that you wanted to get me off this case, but that ain't going to happen. Those comments made it clear this was not just a court who was approaching this the way any judicial approach should have been made. This was not that at all. And when you look at his opinion and you look at the analysis that he made, for instance, the poisoning the well analysis, I mean, it's just ludicrous. He was completely wrong on the facts, but that didn't matter. He blew right past the facts because his anger was driving him. Poisoning the well? I'm sorry? Poisoning what well? Well, his statement, the reason that he, in the order, the reason that he disregarded the opinions of all the treating physicians, including the three who testified, was that I had poisoned the well because I had spoken with them and given them lab results and other medical records. And he said, and he inappropriately said that was a violation of the, I'm blanking on the case right now, the 26B2 ruling that we cited in the brief that he cites in his opinion, said that I had to get expert witness statements from them because they were no longer just treating physicians. They were now expert witnesses. Now, the Goodman case, Goodman versus... Which doesn't say anything at all that it would be inappropriate to share reports and articles with an expert. It's just if they go beyond their expertise as a treating physician and now testify to causation, then you would have to make full disclosure. But there's nothing improper about a lawyer sharing information with an expert witness. I assume the government lawyer did with all of their experts. I mean, I practiced law for almost 20 years. That's what lawyers do. That's what you got to do. Be guilty of malpractice if you didn't do it. So, but, you know, moreover... But wasn't his point that you were sharing causation information with them and they were just treaters and he viewed that as improper? Yeah. His point was that I was influencing their testimony and their diagnosis. But the problem with his analysis is he was just wrong on the facts. He had me... What fact was he wrong on? He wasn't wrong on the fact that you provided information to the treating physicians. He was wrong on the timing of that. And because he's wrong on the timing, his conclusions about... How was he wrong on the timing? How was he wrong on the timing? Well, for example, he said with Dr. Yarbrough, who's a psychologist who treated Lacey in Pensacola, Florida, he treated her and came to his diagnosis that thallium was the cause of her psychological and neuropsychological problems in 2003. He gets... He's going to have his deposition taken in 2005. I go back there, talk to him before his deposition, and he testifies in the deposition consistent with his records and his diagnosis of months earlier, a year and a half earlier, I think, that her problem was caused by thallium toxicity. Now, when the district court reviews all this, in his order, he says that I talked with him in 2003, which is just wrong, factually. And the source he uses is Dr. Yarbrough's deposition. And when you read the deposition, we pointed out in our brief, I'd never met Dr. Yarbrough until his deposition in 2005. By that time, he had already made his diagnosis. Was his diagnosis in any way influenced by information that was given by the parents in terms of the exposure on the naval base? Sure. He's taken a history. That's where he gets it principally is from the parents, from other medical records. He was brought in by the Escambia School District because when Lacey was starting to attend kindergarten, there was obviously something emotionally wrong with her, neurologically wrong with her. And so they got a bunch of doctors together, including Dr. Stephen Sharp, who was a pediatric neurologist. He's a colonel in the Air Force. He decided, after examining her, that she was suffering from thallium toxicity. I've never talked to Dr. Sharp. Then she is also seen by her treating pediatric neurologist, Dr. Ben Renfro. I did talk to Dr. Ben Renfro, and the court seems to see some poisoning of the well there, even though Dr. Renfro had reached his diagnosis months before I talked with him. But you talked to him before he testified, right? Sure. Yes, I did. And this is not an expert. This is a treating physician. Yes. So wasn't the judge's complaint that you were treating a treating physician as if he were an expert, and you weren't following the procedures as to experts? That's what he was saying, but it's not true. It's not true because, for one reason, the Goodman case is sensitive. What is the justification for giving this information to a treating physician? A treating physician treats the patient, can testify about information gained in the course of treatment. Right. What is the justification for giving him this additional information, which he would give to an expert but not to a treating physician? What is the justification for that? To give him background that he doesn't have, for instance, Dr. Eichenfield, the dermatologist. No, I understand that, but if his testimony is about treatment, how does talking to a lawyer and providing this external information help in that process? I mean, he treats the patient, finds out in the course of treatment, in the course of office visits, makes a diagnosis, and testifies to that. What is the point of having the lawyer give him this information? Well, he does more than that, Your Honor. He reaches a diagnosis. Yes, I understand. That's what doctors do. Right. But he does that in the course of treatment, right? Right. What is the point of giving him this additional information other than to influence or strengthen or back up or give him additional to influence what he's going to say in his testimony? Well, you know, of course it's to give him background information. Well, wasn't that Judge Benitez's point is that you were treating a treating physician as if he were an expert, but you weren't following the rules as to experts? But I was. I was following the rules as to expert because the rule he said that I violated. I see. So these were not treating physicians. They were testifying as experts. No, they were treating physicians talking. They were treating physicians testifying on causation and treating physicians testifying on what her symptoms were, the fact that she had peripheral neuropathy, the fact that she had brain damage, encephalopathy, and the fact that she had hair loss. And the only thing that fits that is how it was. What's the point of giving the physician additional information after the treatment and before he testifies? What is the point of that? Well, it depends on what you're talking about. When I'm talking about giving him research material on thallium toxicity, and by the way, this was a Well, if his conclusions are supposed to be based on treatment, what does getting information from the lawyer, how can that in any way properly influence it? But, you know, more to the point, I don't see what, how this impugns Judge Benitez. It sounds strange to me that you did it when you're dealing with a treating physician. I don't think I've ever seen that before, where a lawyer provides outside information. Treating physicians are treating physicians. They base it on the file, and they can come and testify about that. But what's wrong with Judge Benitez questioning that? What is that? Because the basis of his questioning is that I gave this to them to influence their opinions. Well, of course you did. If it wasn't to influence their opinion, what would be the point of giving it to them? So they would have background information that they may not otherwise have that was public? Well, that was Judge Benitez's point. He thinks that that's the kind of thing you ought not to be doing when dealing with a treating physician. Now, you may disagree with that. You may think that he is wrong in that. I'm not sure he is wrong. But there's certainly nothing improper in saying, look, this is a treating physician. You are giving him information outside of treatment before he testifies. This is going to influence his testimony. And you therefore have messed with the testimony of a treating physician. I can't trust it. What's wrong with that reasoning? Your Honor, this very point came up on a Daubert hearing before the case ever went to trial the first time around. This very issue about giving Dr. Renfro lab results and medical charts from other doctors and reports, published reports. Magistrate Judge Battaglia, who did the Daubert hearing, said there was nothing wrong with that. And he saw nothing wrong with that. There was nothing unusual about that and nothing wrong with it. Judge Benitez affirmed that ruling. And then when his new order comes out, all of that disappears and he finds something sinister about all this. So before it was fine, but now it's not. And I asked the Court to look at Magistrate Judge Battaglia's Daubert hearing ruling because that very point came up. He's now, as you probably know, he's an Article III judge in San Diego. But when he looked at it, he found absolutely nothing wrong with it. And, frankly, I've never heard anybody say there's anything wrong with it. Now, the Goodman case comes out in 2011. Now, remember, all of this happened back in 2003, 2004. So the Goodman case, by its own terms, says it's only prospectively to be applied. So there's absolutely no retrospective application. So nothing that went on was in violation of any federal rule, Rule 26 or anything else. There's nothing wrong with it. But what happens, the thing that was wrong, Your Honor, is he said that I influenced them before they even came up with their opinion, and it's just totally false. It's not true. All you have to do is look at the records, and you see that they had already reached their opinions that Lacey was suffering from thallium toxicity months, and in some cases years, before I even talked to them. You are well over your time. Okay. We'll hear from the government. May it please the Court, Adam Bain for the United States. Judge Benitez decided this case based on evaluation of witness testimony and exhibits over five weeks of trial. This included hundreds of exhibits consisting of thousands of pages of medical records, technical expert reports, and a lot of information. It was a difficult, complex case. It took a long time, but Judge Benitez wanted to get it right, especially after he had been reversed by this Court in his first ruling. It's plain from Judge Benitez's opinion that it was based on a thorough evaluation of the evidence, including a detailed examination of the written record and determinations of witness credibility. The district court's decision should be given deference. There was no bias. Significantly, Judge Benitez was . . . What was the point of all of the colloquy about what happened in the Ninth Circuit and who gets the last word and what the attorney did? What was the point of all of that? Frankly, Your Honor, I think the point was that Judge Benitez was venting a little bit. He mentioned in that hearing that he wanted to get it off his chest, and then he said, I feel a lot better now, but that did not mean he was not impartial or that he would disregard his oath to do justice without respect to persons from that point forward. Mr. Bain, I want to talk to you about the standard that we judge recusal, whether he should have recused himself. And Lake Key, and I think you cited it appropriately, is a very, very high standard. It's a very rare case. Would you agree with that? That's correct. And would you agree that Justice Kennedy's concurring opinion established a much broader standard that would be easier for the plaintiff to make in this case? That's correct. Okay. Have you read the Caperton opinion? No, I'm not familiar with that. Well, it's the latest Supreme Court decision on recusal involving the West Virginia judge. And in that case, Kennedy wrote the opinion. It was a 5-4 opinion. And he cited the standard as his concurring opinion in Lake Key. So I'm wondering whether it's the majority opinion in Lake Key or what Justice Kennedy seemed to suggest was the standard in Caperton that applies in this case. I believe that the Lake Key standard does apply. Even without reading Caperton, you believe that? Well, I would read Caperton, but it hasn't been brought to my attention, so I wouldn't think that it was. Well, he only cites to his concurring opinion, and he had a majority of the court join that opinion. So I'm wondering if the standard hasn't changed. Well, I would think that it's even a very high standard, and I'm not sure what he said the standard was in the Catherton case, but it is a very high standard when it comes from an extra. It's the same standard he said in his concurring opinion he cited to it, which is a much broader standard. It's still a high standard, right? You're right. It's still a high standard. It's a very high standard, and it has to do with evaluation of all of the circumstances. You can't just take a few quotes from 10 years of litigation. Even this court's jurisprudence on this says you have to be well-informed, you have to consider all the circumstances. The plaintiff's provided 22 pages out of 153 or more page transcript. Yeah, I've read the whole transcript, though. I've read all 153 pages. And it's interesting that he doesn't even let it go. At the very end, he comes back to it. I mean, he gets it off his chest, but then he comes back to it. And let me ask you this. This is what I thought was really interesting. Section B-1 of the plaintiff's brief, really, on their argument, the first six pages are devoted totally to their view about why Judge Benitez was angry with the court's opinion. And you didn't address that at all in your brief. You had one sentence in your introduction, second sentence of the second paragraph of your introduction, and then when you get to the rest of your brief, you never even mention it. So my question is, under Ninth Circuit law, why haven't you weighed that argument? The argument is that he was angry with the Ninth Circuit. It was a natural reaction to... But you didn't address it in your brief, in your response to the brief. It was directly relevant. It was the first six pages of the appellant's brief. If and when you ever lose as a trial counsel and you're the appellant, don't you put your strongest argument first? Well, I didn't really think it was a strong argument. So you just decided to ignore it completely? That was the decision that we made. Okay. Yes, because we didn't think it was relevant how many cases were in the Southern District of California versus how many cases were in your district. The judge was venting at the very beginning of that hearing, and he wanted to get it off his chest. We wish he would have done it in chambers to his law clerks, but it's not an unnatural reaction. No, it's not, except that it was three months after our opinion, and then in 2014 or 2015, four years later, he's playing a tape recording of the oral argument from 2011. So it wasn't just a question of venting. He was still upset with plaintiff's counsel and with this Court's opinion in 2015. I think in 2015, the hearing you're referring to, Judge Bennett, he was upset primarily with plaintiff's counsel because what occurred at that hearing is he was two months away from issuing his decision. He had thoroughly studied the record at that point. He said he had reread every page of the transcript, looked at every exhibit, and the plaintiff's counsel asked him. Including exhibits that weren't in the record because apparently counsel didn't call out what was admitted and what wasn't. Remember there's that discussion about there's a 3,000-and-some-page exhibit. He claims he read everything, but only 22 pages were actually admitted. Actually, that was admitted. That was designated on the pretrial exhibit list of the United States. There was no objection made by plaintiffs to that exhibit. Judge Benitez said that any exhibit that had been referred to during the bench trial was considered admitted. I don't know how that mistake was made on the post-trial exhibit list, but that exhibit was discussed thoroughly at the September hearing. Plaintiff made no objection at that time to the judge considering that entire exhibit. So that was a proper exhibit before the Court. This was a bench trial. The Court was the finder of fact. And the judge's questions at the September 2014 hearing were he was trying to reach his decision. Plaintiff's counsel had asked for the hearing, had offered to answer any questions that Judge Benitez had. Judge Benitez had several questions for plaintiff's counsel. He went through very thoroughly. If you read the entire record, you'll see. I have it right here. Yeah, you'll see that he went through it very thoroughly. He did. He had some questions. And several times, and I can go through them, Judge Benitez found plaintiff's representations to be contrary to his understanding of the record. And that's when he got to the point where he said he could not trust what plaintiff's counsel was representing. And that's when he went back to the Ninth Circuit argument, and he played portions of that argument to show even at the Ninth Circuit Court of Appeals, Mr. Cox had made statements about talking three days about the site health and safety manual when he talked about it for like 10 pages of the transcript. I think it was six. I wasn't very much. Don't hold me to that. But he had made some outrageous statements to this panel in the last argument, and Judge Benitez was upset that he could not trust the representations of plaintiff's counsel. It made his job much more difficult when he could not rely upon representations that were being made by counsel in the case. And I think that's one of the reasons why it took him so long to issue an opinion in this case. But I will say that Judge Benitez did not. Well, wait, how could that have been the reason why it took so long? Because he didn't have the hearing until two months before he issued the opinion, 60 months at best since the trial. But he had been, he said he had been thinking about that every day and that he had been rereading the record and looking through every exhibit. And listening to the oral argument. And listening to the oral argument because he did not want to get reversed again. And one of the things that was brought up at the last argument was that where is Judge Benitez's finding on this issue? It wasn't in the last order. If you recall, Judge Benitez's earlier order was very brief. His order this time was very thorough. He went over every issue in the case. It was very thorough. And decided it. And I want to emphasize that Judge Benitez did not have a predetermined judgment on remand. He was very interested in finding out what happened. He allowed plaintiff more than a fair opportunity to prove the case. Allowed plaintiff to call an expert that had not been identified before the close of discovery. An entirely new expert. Allowed that expert to submit a sur rebuttal report just a few weeks before trial began. Both over the United States objections. Allowed plaintiff's counsel additional argument and additional questioning even after all their time had run out that was given to them at the beginning of trial. Even allowed plaintiff's expert to offer a completely new opinion at trial that had not been disclosed in any expert report and that the expert had specifically said I do not have an opinion on that at deposition. So he allowed plaintiffs to put on a case very fairly. And I should say that even after closing argument, Judge Benitez said that he was torn between his head and his heart in this case. And when he said his heart, he wasn't referring to the government. This was a case about a sick little girl and he really wanted to know what happened to her. And he really viewed the evidence very closely. He asked questions of both sides' experts. He was very concerned about the little girl. And he was paying attention very closely and allowing plaintiff every opportunity to prove the case. And he encouraged the parties numerous times to settle the case. I think including at that last conference, I may be wrong about that, but I think even at that last conference two months before he issued the opinion, he still encouraged the parties to settle. We went to mediation over a half dozen times in this case throughout the course of litigation. So he was encouraging a settlement in this case. You heard the colloquy with Mr. Cox about the poison in the well comment. Do you have a view on that? I do. What he describes as poison in the well. I don't think the judge actually used that term. He mentioned that with respect to the treating physicians. And they were offered as expert witnesses. And he referenced that because plaintiff's counsel provided material to them and they provided opinions that went beyond the scope of their treatment. He did not apply that to the universe of the treating physicians in this case. And plaintiff's counsel said over and over again that treating physicians made diagnoses that Lacey Myers had conditions related to thallium exposure. But if you look closely at the records, what that really is is the initial visit that the parents had with the treating physicians. They described their daughter's conditions as being related to thallium exposure. That's what plaintiff's counsel has turned into a diagnosis of thallium exposure. None of the treating physicians did a rigorous differential diagnosis that courts accept as being an expert opinion that thallium was related to the condition that the daughter has. So it's just not true that the treating physicians, without Mr. Cox providing material to them, had the opinion that their daughter's condition was related to thallium exposure. But setting that aside, Judge Benitez heard the experts from both sides and he made his own credibility determinations which are virtually bulletproof on appeal with regard to which expert testimony he believed. That's correct. And plaintiffs have not challenged the government's experts at all. We had very qualified experts. They all did a rigorous differential diagnosis and concluded that her condition was not related to the activities that occurred at the landfill. So this is a case where it was a long, complex case. There was a lot of witness testimony. There were expert witnesses on both sides, evaluations of witness credibility. Judge Benitez's decision in that regard should be given deference. I mean, I would finally ask this. Yeah, wasn't it pretty important to Judge Benitez that the government subsequently found out after the first trial that the younger sister, who I think had just been born maybe, she had the same hair loss condition. She had alopecia as well. Alopecia, that's right, yeah. And it occurred over a year after they had moved away from Camp Pendleton, so that in no way is consistent with thallium exposure, and it went to show that it was a genetic condition, genetically predisposed to it. Pre-existing genetic condition. And a big factor also going to the parents' credibility is that was not disclosed in response to a direct question that was asked to both parents back in 2005 before the first trial in this case. We only learned about it after the first trial. How did you find out about it? We found out about it through a posting of a picture on MySpace. The parents posted a picture of the younger daughter on MySpace, and she had lost her hair, and that caused us to inquire about it. We had asked for family medical records as part of discovery, the parents' records, and we were, you know, it was a big battle over whether we were allowed to get that or not, and the magistrate ruled that we were not allowed to get that unless there was some other showing that it would be relevant. So we were not able to get family medical history in the early stages beyond the records of the daughter, or Lacey Myers. Mr. Bain, to me this would be a very easy case if we didn't have the recusal issue because Judge Beditas clearly was in his discretion to disbelieve plaintiff's counsel, the plaintiff, the parents, and the experts, which he didn't buy any of the plaintiff's case. That was certainly within his discretion, but what troubles me is I've never seen a judge on the record be so hostile about being reversed, and I don't know how else to describe it. I mean, we all get reversed, and he said as much, but he was really angry because he accused me of not having read the record. I think what he thought was that you did not understand why he considered the urine evidence to be relevant to forced abortion. That isn't what he said. He said I didn't read the record. Didn't he? He did in that context. Yes. And I think he thought you did not understand his feelings about why that was relevant to foreseeability. But what I would say finally on the recusal issue, and I'm almost out of time, is that if he was so biased, why wasn't there any material effect on the plaintiff's case? Why isn't there any clear air of back or wrong? Well, wait a minute. He didn't believe the plaintiff, he didn't believe the plaintiff's experts, and he didn't believe or trust plaintiff's counsel. But those are credibility determinations that are supported by the record. So what did you expect him to do, to say at the end of the opinion, I wrote this opinion because I'm still angry at the Ninth Circuit opinion? No, I didn't expect there to be a clear air of law like there was in the Hague case that recently came out from this court where the judge found that water rights gave you a defense to a trespass action, which was clearly contrary to circuit precedent or something like that. So I know your time's up, but I want to ask you this. Part of your argument is that the plaintiff did not specifically request recusal, right? Yes. And the judge that spread the mandate hearing said that they had asked for a new judge and that wasn't going to happen. And I think that was a reference to the plaintiff's appellate brief, which asked that if there was a remand it be reassigned to a different judge, and we said, I said, I wrote the opinion, I said no. Is that right? That's correct. Okay. Now, there's a higher standard when you don't specifically make a request, right? Right.  that excused the party from making a recusal request when they made their basis known? I'm not familiar with that, but I'm not familiar with any case in this circuit in which just because they think a request is going to be futile, that means it's as good as having made the motion. The government needs to have a chance to respond to a motion in order to give. But wasn't Judge Benitez pretty adamant? And he's the one that raised it, actually. Well, no, I think the plaintiff had said they have some concerns that his anger about the opinion would spread over to the plaintiff, and then Judge Benitez says, well, I know you tried to get another judge and that's not going to happen. Do you think that might excuse them from formally making the motion at that time? I do not believe it does because it doesn't put the government on notice that it needs to make a response and argue why the judge should not recuse himself. So I think that the highest standard should apply. And Judge Benitez said after that colloquy, I am not biased toward either side. I am not going to let the Ninth Circuit's opinion have anything to do with Lacey Myers and what happened to her. And that's true. He wanted to find out what happened to her. The judge said he's not a bigot either. Isn't that kind of self-serving when you say that? But I think if you look at what he did throughout this case, gave the plaintiff every opportunity to prove a case. That is conduct which goes to show that he was not biased. He was looking very carefully. And also his statement after closing argument that he was torn between his head and his heart shows that he was looking at it very carefully. And finally, the 120-page opinion, which very carefully goes through the evidence, and there's four independent reasons why there was no causal connection. That shows that he was being very careful. If there's nothing further, thank you. Okay. You all have time. We'll give you a minute for a buck if you wish to take it. You don't have to. I know. I don't think you ever tell a lawyer he's got time and then he doesn't want it. Smart ones do. Okay. Maybe I should sit down. Go ahead. I'm just telling you. My wife never takes rebuttal time. Except at home. That's my experience as well, Your Honor. There we go. Anyway, we'll give you a full minute there. Go ahead. The thing that I think Mr. Bain commented on, and I'm not quite sure how it came up, and I think it was in questioning with Judge Bennett about how my comment, or the district court's comment to me, that I know you tried to get rid of me in front of the Ninth Circuit. And when he looked at me and said, but that isn't going to happen, it made it very clear to me that a motion to recuse at that point was going to go nowhere, and I would just further antagonize him. And so there we go. I had to play the hand I was dealt. That's what I did. And I would just say one other thing on the poisoning the well term, Your Honor. That is a term that comes right out of his opinion, right out of that order. There's a place where he, I think he titles it as a head. Subheading. Pardon me? It's a subheading, I believe. Yeah, subheading. And it basically says exactly that. So I would just point out that that's not something I made up. That's in the order. So that's all I have. Okay. Thank you. Cases are usually submitted. We're adjourned.
judges: Kozinski, Rawlinson, Bennett